**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES JARMON,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 21-3889** |
| | : | |
| **TRADER JOE'S COMPANY,** | : | |
| Defendant. | : | |

## MEMORANDUM

**Younge, J.**                                                          **March 8, 2023**

## I.      INTRODUCTION

Currently before this Court is Defendant Trader Joe's Company's ("Trader Joe's") Motion for Summary Judgment (ECF No. 16).  The Court finds this motion appropriate for resolution without oral argument. Fed. R. Civ. P. 78; L.R. 7.1(f).   For the reasons set forth in this Memorandum, Defendant Trader Joe's Motion for Summary Judgment (ECF No. 16) will be granted in part and denied in part.

## II.     FACTUAL BACKGROUND

James Jarmon ("Plaintiff") has filed this civil action against his former employer, Trader Joe's Company ("Defendant") alleging racial discrimination and retaliation.  On September 25, 2017, Plaintiff started working for Defendant as an Assistant Store Manager (also known as a "Mate"). (Am. Compl. ¶ 22, ECF No. 7; Def. Statement of Undisputed Material Facts ("Def. SUMF") ¶ 7, ECF No 16-2.)   During his tenure, Plaintiff would work at four of Defendant's locations: (1) Philadelphia, PA; (2) Media, PA; (3) Wayne, PA; and (4) North Whales, PA. (Am. Compl. ¶ 23, 32, 51, ECF No. 7.)   On or around December 2017, Plaintiff had been transferred from Defendant's Center City Philadelphia location to Defendant's Media, PA location. (Def.

SUMF ¶ 11, ECF No. 16-2.)  While at Defendant's Media, PA location, Plaintiff claims to have experienced racial discrimination in the following ways: a co-worker telling Plaintiff that he resembled a starving child in Africa; having an eggplant and greeting card resembling a white supremacy hand sign placed in his employee locker; being falsely accused of stealing and being lazy; receiving harsher performance criticism than his non-Black peers; and not being given a raise or a bonus, while his non-Black colleagues—who performed at or below his level—received them. (Am. Compl. ¶ 25, ECF No. 7.)  Upon completion of Plaintiff's paternity leave in or around May 2020, Plaintiff alleges that Defendant did not allow him to return to its Media, PA location because Defendant's employees did not want Plaintiff there anymore—ultimately resulting in Plaintiff's transfer to Defendant's Wayne, PA location. (Am. Compl. ¶¶ 29-32, ECF No. 7.)

While at Defendant's Wayne, PA location, Plaintiff alleges additional instances of racial discrimination.  In or around August 2020, Plaintiff submitted a complaint of racial discrimination to Defendant's Human Resources Department after management failed to ask a non-Black customer to leave the store after Plaintiff informed management that the customer had made unwarranted and offensive remarks to Plaintiff. (Am. Compl. ¶¶ 34-36, ECF No. 7.)  Upon learning of the complaint, Plaintiff's then-manager—Sha Ron Williams—allegedly became very angry and chastised Plaintiff for filing the complaint and stated that such behavior was one of the reasons why Williams does not hire Black people. (Am. Compl. ¶¶ 37-41, ECF No. 7.)  Williams' alleged comments prompted Plaintiff to complain to Defendant's Human Resources Department. (Am. Compl. ¶ 42, ECF No. 7.)  Shortly after Plaintiff complained to HR, Williams wrote Plaintiff up in connection with his handling of the interaction with the non-Black customer who allegedly made offensive remarks—causing Plaintiff to file another HR complaint for what he perceived to be a retaliatory write up. (Am. Compl. ¶¶ 43-48, ECF No. 7.)  On January 15, 2021, Plaintiff had been

informed that he would be written up again (for allegedly failing to lock the back door of the store), and would, on January 18, 2021, be transferred to Defendant's North Whales, PA location. (Am. Compl. ¶¶ 49-52, ECF No. 7; Def. SUMF ¶¶ 74, 80, 83, ECF No. 16-2.)

While at Defendant's North Whales, PA location, Plaintiff—on May 26, 2021—initiated an FMLA-approved leave of absence because of the alleged hostile work environment Plaintiff had been subjected to by Defendant. (Am. Compl. ¶¶ 54-55, ECF No. 7; Def. SUMF ¶ 92, ECF No. 16-2.)  In or around the end of July 2021, Plaintiff returned to work from his FMLA leave and would be issued another write up for alleged performance and attendance issues that occurred prior to Plaintiff's leave. (Am. Compl. ¶¶ 57-58, ECF No. 7.)  On August 31, 2021, Plaintiff filed a complaint in this Court—alleging discrimination and retaliation in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981") (Count I), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII") (Count III), and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq*. ("PHRA") (Count IV). (Am. Compl. ¶¶ 74-98, ECF No. 7.)  Since filing his Amended Complaint, Plaintiff has voluntarily dismissed his claim for retaliation under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA") (Count II). (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., p. 1, n.1, ECF No. 17.)  On September 4, 2021, Defendant alleges that Plaintiff engaged in an inappropriate conversation about guns with a colleague on the sales floor in front of customers.  (Def. SUMF ¶¶ 101-104, ECF No. 16-2.)  On September 10, 2021, the Philadelphia Magazine published an article covering Plaintiff's claims and his recently filed civil action against Defendant. (Def. SUMF ¶ 114, ECF No. 16-2.)  On September 18, 2021, Defendant's Regional Vice President—Ylana Ebba—terminated Plaintiff based on his September 4, 2021 conversation being "completely inappropriate" along with other alleged performance issues. (Def. SUMF ¶¶ 107-108, ECF No.

16-2; Am. Compl. ¶ 61, ECF No. 7.)  Though Defendant alleges that the decision to terminate Plaintiff had been made prior to the publication of the article, Plaintiff's termination letter is coincidentally dated September 10, 2021—the same day that the Philadelphia Magazine article had been published. (Def. SUMF ¶¶ 110, 115, ECF No. 16-2.)

Currently before this Court is Defendant's motion for summary judgment—wherein Defendant alleges that Plaintiff has not sufficiently demonstrated racial discrimination or retaliation under Section 1981, Title VII, or the PHRA. (Def. Mot. for Summ. J., ECF No. 16.)  In response, Plaintiff argues that the September 4, 2021 conversation had been pretextual and in line with other frivolous disciplinary actions taken against Plaintiff and that his termination had come shortly after both his filing of his initial Complaint in this Court and the Philadelphia Magazine's coverage of his claims. (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., ECF No. 17.)

## III.   LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012).  To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to

establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV.    DISCUSSION

As an initial matter, it is worth noting that Plaintiff's claims across Section 1981, Title VII, and the PHRA can be consolidated for purposes of this analysis. *See Harley v. McCoach*, 928 F. Supp. 533, 538 (E.D. Pa. 1996) ("[Plaintiff's] Title VII, PHRA, and § 1981 claims all fall under the same analytical framework, and will therefore be examined together.")  Relatedly, Plaintiff's racial discrimination and retaliation claims are both subject to the *McDonnell Douglas* burden-shifting framework. *See Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (applying *McDonnell Douglas* to Title VII racial discrimination claims); *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (applying *McDonnell Douglas* to retaliation

claims).   Thus, this Court will consolidate Plaintiff's respective racial discrimination and retaliation claims across Section 1981, Title VII, and the PHRA, and will apply the *McDonnell Douglas* burden-shifting framework to both sets of claims.

Of import here, the Third Circuit has described the three-step, burden-shifting framework as follows:

> First, the plaintiff must establish a prima facie case of discrimination [or retaliation].
>
> If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory [or nonretaliatory] reason for the employee's rejection."
>
> Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination [or retaliation].

*Shaner v. Synthes*, 204 F.3d 494, 500–01 (3d Cir. 2000) (citations omitted) (quoting *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999)).   The Third Circuit further instructs: "Our experience is that most cases turn on the third stage, *i.e.*, can the plaintiff establish pretext." *Id.*

### a.   Disparate Treatment

Though the Third Circuit notes how most cases turn on the pretext stage, this Court cannot overlook the fact that Plaintiff has seemingly failed to establish a *prima facie* case of racial discrimination or disparate racial treatment.   According to the Third Circuit, "[a] disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990).   Under a disparate treatment theory, "proof of the employer's discriminatory motive is critical." *Id.*   To

establish disparate treatment, a plaintiff must show that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  The U.S. Supreme Court reiterated that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Turning to the first step of the *McDonnell Douglas* burden-shifting framework, Plaintiff and Defendant seemingly agree that the first three prongs of a *prima facie* Title VII racial discrimination case are satisfied and, instead, spend the bulk of their time and energy arguing over the fourth prong—*i.e.,* whether Plaintiff's termination gives rise to an inference of discrimination. (Def. Mem. of Law in Supp. of Mot. for Summ. J., pp. 12, 16-20, ECF No. 16-1.)  Under a Title VII termination claim, Plaintiff can establish an inference of discrimination by "demonstrat[ing] that similarly-situated persons outside the protected class were treated more favorably." *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 589 (E.D. Pa.), *aff'd,* 708 F. App'x 48 (3d Cir. 2017).  To be "similarly situated," relevant factors include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009).  However, the Third Circuit also instructs that, "[s]uch an inference [of intentional discrimination] could be supported in a number of ways, including, but not limited to, [1] comparator evidence, [2] evidence of similar racial discrimination of other employees, or [3]

direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010).

In this case, Plaintiff highlights the following examples of discrimination:

> In this case, a reasonable jury could conclude that Defendant's treatment of Plaintiff…was motivated by Plaintiff's race and that the conduct was sufficiently severe or pervasive. Indeed, the following conduct was overtly based on race: Plaintiff was told by his supervisor, ShaRon Williams, that she does not hire Black people because she does not trust them and they embarrass her; Plaintiff's coworkers placed a greeting card with a white supremacy emblem in his locker, and on another occasion, an eggplant; Plaintiff was compared to a starving child in Africa; and coworkers were discussing whether being allergic to cotton meant that you were a slave in a former life. As for the other conduct, there is not evidence that non-Black employees were subjected to this same or similar treatment – e.g., being repeatedly and falsely criticized (including being called "lazy" by a white coworker and being issued a bogus attendance write-up that could not even identify a single attendance incident), being transferred from one store to another after being subjected to this harassment (and complaining about it), and being terminated based on a single conversation with a non-Black coworker who initiated the conversation and engaged in the same exact conduct but was not issued any discipline at all. A reasonable [jury] could conclude that Defendant's treatment of Plaintiff, when looked at as a whole, was motivated by his race and sufficiently severe and pervasive.

(Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., p. 18, ECF No. 17.)

Plaintiff is seemingly attempting to invoke the first and third potential avenues offered by the Third Circuit to infer discrimination—*i.e.,* proffering comparator evidence as well as direct evidence of discrimination from statements or actions by supervisors that suggest racial animus. However, Plaintiff has not provided sufficient evidence at the summary judgment stage.  With respect to comparator evidence, Plaintiff offers his non-Black coworker—Thorne—who had allegedly initiated and engaged in the conversation about guns on the sales floor and who had not been disciplined or terminated.  This argument fails for the simple fact that Plaintiff and Thorne were not "similarly situated"—as Plaintiff was a "Mate"/Assistant Store Manager, while Thorne

was a "Crew Member" (or, in other words, a subordinate). (Am. Compl. ¶ 22, ECF No. 7; Def. SUMF ¶ 101, ECF No 16-2.); *see also Norman v. Kmart Corp.*, 485 F. App'x 591, 593 (3d Cir. 2012) ("[The plaintiff] contends that similarly situated employees were treated more favorably than she was, but the employees to whom [the plaintiff] points were not similarly situated because they…were her subordinates….")

With respect to direct evidence of discrimination from statements or actions by supervisors that suggest a racial animus, Plaintiff's consolidated racial discrimination claims suffer a similar fate.  Plaintiff's then-manager Sha Ron Williams' alleged comments around not hiring Black people because she does not trust them and because they embarrass her are not enough to show the requisite inference of racial discrimination.  After all, the adverse employment action in question is Plaintiff's termination on September 18, 2021.  However, these alleged comments were made in August 2020, and, perhaps most importantly, Williams did not make the ultimate decision to terminate Plaintiff—that decision would come almost a year later and would be made by Regional Vice President Ebba.  Further, even turning to the content of Williams' alleged remarks, the United States District Court for the Eastern District of the Pennsylvania (the "Eastern District") has held that comparable comments are not actionable.  In *Kim-Foraker*, a supervisor stated to the plaintiff—a Korean American—that the supervisor "was taking kung fu; that Koreans always use cash; and that Koreans always work hard, so expectations for [the plaintiff] were greater than those for other employees." *Kim-Foraker v. Allstate Ins. Co.*, 834 F. Supp. 2d 267, 277 (E.D. Pa. 2011). The Eastern District held that "the remarks do not amount to direct evidence of discrimination"— especially since "none of the remarks were uttered when [the defendant] took disciplinary action against [the plaintiff] or made the decision to terminate [the plaintiff's] employment." *Id.*  While Plaintiff could argue that these alleged comments were made around the time that a disciplinary

action occurred (in the form of Plaintiff being written up for his interaction with the non-Black customer), it is hard to impute Williams' comments to Ebba's decision to terminate Plaintiff (which is the central adverse employment action at issue in this case). As such, Williams' alleged comments likely constitute a stray remark made by a supervisor who did not ultimately terminate Plaintiff and who did not seem to directly influence or play a significant role in Defendant's decision to terminate Plaintiff.

Similarly, the different acts and comments by coworkers are stray remarks and incidents that do not carry much weight given that said coworkers were not decision-makers. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J.) (concurring) ("Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard…What is required is…direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."). Thus, if such overt and direct racial and stereotypical comments made by an actual supervisor—not acting in a decisional capacity—do not rise to the level of direct evidence of discrimination, then similar stray remarks made by non-decisionmakers and a supervisor in a non-decision-making capacity (at least with respect to the firing of Plaintiff) also cannot demonstrate intentional racial discrimination on the part of Defendant.

Finally, Plaintiff attempts to bolster his consolidated racial discrimination claims by proffering elements of a hostile work environment claim within the *McDonnell Douglas* burden-shifting framework. For example, Plaintiff notes in his Amended Complaint, "Plaintiff's race was

a motivating and/or determinative factor in connection with Defendant's discriminatory treatment of Plaintiff, including subjecting Plaintiff to a hostile work environment and terminating his employment." (Am. Compl. ¶ 63, ECF No. 7.)  Additionally, Plaintiff highlights how, "[t]o be clear, in this case, Plaintiff has and continues to assert two distinct adverse employment actions: (1) hostile work environment…and (2) termination." (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., p. 17, ECF No. 17.)  In essence, Plaintiff is seeking to make out a *prima facie* case under step one of the *McDonnell Douglas* burden-shifting framework by invoking a theory of a hostile work environment.  However, the Third Circuit has previously instructed that, "the [*McDonnell Douglas*] burden-shifting framework is inapplicable here because…there can be no legitimate justification for a hostile work environment. Therefore, we will not apply the *McDonnell Douglas* burden-shifting framework to [the plaintiff's] hostile work environment claim." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017) (citation omitted).  Thus, this Court declines to analyze Plaintiff's hostile work environment theory under his consolidated racial discrimination claims—which are subject to the *McDonnell Douglas* burden-shifting framework.

With no comparator evidence, seemingly stray remarks from co-workers and a supervisor in a non-decision-making capacity (at least with respect to the firing of Plaintiff), and Plaintiff's inability to integrate his hostile work environment theory into his consolidated racial discrimination claims, this Court cannot identify evidence or facts that would satisfy the first step of the *McDonnell Douglas* burden-shifting framework—*i.e.,* making out a *prima facie* case. Thus, this Court will not review steps two and three, and will grant Defendant's motion for summary judgment with respect to Plaintiff's consolidated racial discrimination claims—as a reasonable jury could not infer that Defendant is liable for racial discrimination and disparate treatment under Section 1981, Title VII, and the PHRA.

**b.  Retaliation**

This Court next reviews Plaintiff's consolidated retaliation claims.  Like Title VII discrimination claims, the *McDonnell Douglas* burden-shifting framework also applies to Title VII retaliation claims. *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006), *as amended* (Sept. 13, 2006).  However, the standard for causation differs across step one (the *prima facie* stage) and step three (the pretext stage). "[A]t the prima facie stage the plaintiff must produce evidence 'sufficient to raise the inference that [the plaintiff's] protected activity was the *likely reason* for the adverse [employment] action.'" *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (emphasis in original) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 179 (3d Cir. 1997).  At the pretext stage, Plaintiff must show but-for causation and that retaliatory animus was the *real reason* for the adverse employment action. *Id.* at 258 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)).

Turning to the first step of the *McDonnell Douglas* burden-shifting framework, Plaintiff must establish a *prima facie* case by showing that: "(1) [the plaintiff] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [the plaintiff]; and (3) there was a causal connection between [the plaintiff's] participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006).  In this case, Plaintiff and Defendant agree that the first two prongs of a *prima facie* Title VII retaliation case—engaging in protected activity and the occurrence of an adverse employment action—are satisfied. (Def. Mem. of Law in Supp. of Mot. for Summ. J., p. 23, ECF No. 16-1.)  Instead, the parties disagree over whether the third and final prong has been established.  Under the third prong, the "temporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link." *Williams v.*

*Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).  Though, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* (quoting *Shellenberger,* 318 F.3d at 189 n.9).  The Third Circuit has also noted that, "where 'the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test....'" *Id.* (quoting *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003)).  For context, the Third Circuit has found that two days between protected activity and termination was sufficient to make out a retaliatory discharge claim. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).  On the other hand, the Third Circuit held that a three-week gap between the protected activity and the termination (along with an assessment of the record as a whole) had not been enough to demonstrate an unusually suggestive temporal proximity. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).  Though Plaintiff had been terminated approximately two-and-a-half weeks after filing his complaint and falls closer to the three-week gap, this Court finds that the record as a whole—especially the timing of Defendant's termination letter being drafted on the same day as the publication of the Philadelphia Magazine article covering Plaintiff's claims against Defendant—raises legitimate questions around whether a retaliatory motive could have been the likely reason for Plaintiff's termination.

Turning to the third step (*i.e.*, the pretext stage) of the *McDonnell Douglas* burden-shifting framework, Plaintiff must show that the reasons proffered by Defendant for terminating Plaintiff are false and merely a pretext for retaliation.  This means that Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason

was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  To establish pretext under the first *Fuentes* prong, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (citations omitted) (emphasis in original).  Additionally, with respect to Title VII retaliation claims, at the pretext stage, the plaintiff must show "that retaliatory animus was the 'real reason' for the adverse employment action" and "that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017) (referencing *Moore*, 461 F.3d at 342) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)). While the Third Circuit recognizes that "this standard places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Here, the temporal proximity of Defendant's actions lends credence to the possibility that Plaintiff's filing of his civil action and the subsequent media coverage were likely the *real reasons* for Plaintiff's termination.  On September 18, 2021, Defendant's Regional Vice President—Ylana Ebba—terminated Plaintiff based on his September 4, 2021 conversation being "completely inappropriate" along with other alleged performance issues—*i.e.,* the legitimate, non-retaliatory reason for Plaintiff's termination. (Def. SUMF ¶¶ 107-108, ECF No. 16-2; Am. Compl. ¶ 61, ECF No. 7.)  Though Defendant alleges that the decision to terminate Plaintiff had been made prior to

the publication of the Philadelphia Magazine article, Plaintiff's termination letter had coincidentally been drafted on September 10, 2021—the same day that the article had been published and just eleven days after Plaintiff's filing of his civil action in this Court. (Def. SUMF ¶¶ 110, 115, ECF No. 16-2.)  Further, the parties disagree over whether Plaintiff had been previously instructed not to have conversations about guns on the sales floor prior to the September 4, 2021 conversation with his coworker that led to Plaintiff's termination. (Def. SUMF ¶¶ 104, ECF No. 16-2.)  If the factfinder determined that no prior instruction had been given, it could lend more weight to Plaintiff's theory that the conversation was used as a mere pretext to retaliate against Plaintiff for filing his civil action.  Alternatively, if the factfinder determined that Plaintiff had been given previous instruction, it could lead to the conclusion that Plaintiff had been put on notice and that the decision to terminate Plaintiff was done for legitimate, non-retaliatory reasons. Stated differently, the current timeline of events (from August 31, 2021 to September 18, 2021) creates genuine issues of material fact for a jury (and not this Court) to assess, analyze, and resolve.

Taken together, Plaintiff's consolidated retaliation claims will proceed—as a reasonable jury could infer that Defendant is liable under Section 1981, Title VII, and the PHRA.

## V.    CONCLUSION

For the foregoing reasons, Defendant Trader Joe's Company's motion for summary judgment is granted—with respect to Plaintiff's consolidated racial discrimination claims—and denied—with respect to Plaintiff's consolidated retaliation claims.

An appropriate Order follows.

**IT IS SO ORDERED.**

**BY THE COURT:**

_/s/ John Milton Younge_
**JUDGE JOHN MILTON YOUNGE**